James G. Moore and Josephine B. Moore, His Wife, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 15922.   Promulgated July 21, 1948.

*James G. Moore, Esq., pro se.*
*John J. Madden, Esq.*, for the respondent.

### OPINION.

Disney, *Judge*: This case involves income tax for the taxable year 1943.   Deficiency was determined in the amount of $300.12.   The entire amount thereof is involved.   The issue presented is whether the petitioners may, in the year 1942, consider as a war loss, under section 127 (a) (1) of the Internal Revenue Code, the taking by the Civil Air Patrol of an airplane owned by them, which, while being used by the Civil Air Patrol, was destroyed and was later, in 1943, after being repaired by the petitioners, returned to them and again taken from the petitioners under requisition by the Department of Commerce, Civil Aeronautics Division.

We adopt by reference as our findings of fact the stipulation of all facts filed by the parties, reciting as follows:

1. The taxpayer, James G. Moore, is a practicing attorney, and the taxpayer, Josephine B. Moore, is a housewife.

2. Petitioners filed joint income tax returns for the calendar years 1942 and 1943 with the Collector of Internal Revenue, Second District of New York.

3. The taxpayers owned Stinson Aircraft NC32253, purchased from the Consolidated Vultee Aircraft Corporation on May 30, 1941, at a cost of $5,241.

4. On or about October 5, 1942, the petitioners received a telegram in words and figures following:

RESTRICTED       OFFICE OF CIVILIAN DEFENSE
WASHINGTON, D. C.

SPECIAL ORDERS }    CIVIL AIR PATROL    NATIONAL HEADQUARTERS
No. 132                         Washington, October 5, 1942

    1. Authority LI–17, GASC. *8/13/42 aircraft Stinson 10A NC32253 is assigned to active service CAP Coastal Patrol No. 18, Falmouth, Mass.

    By direction of National Commander JOHNSON:

HARRY H. BLEE
*Colonel, Air Corps*
*Operations Officer*

(SEAL)
OFFICIAL:
[SIGNED]

    HOWARD S. STERNE

    HOWARD S. STERNE
    *Captain, Army Air Forces*
    *Ass't Operations Officer*

Dist:

| | |
|---|---|
| 1–Per Individual | 2–CP File |
| 1–Personnel | 1–Operations |
| 1–Fiscal | 1–File |

    Note: Abbreviations mean: Letter of instructions 17 Ground Air Support Command.

    5. Pursuant to the foregoing telegram, petitioners, on or about October 14, 1942, delivered the aircraft to the Civil Air Patrol at Falmouth, Massachusetts.

    6. Thereafter, the said aircraft was in the sole and exclusive possession of the Civil Air Patrol and used in anti-submarine operations, the petitioners receiving $3.50 for each airborne hour, as per specimen voucher attached and marked Exhibit 1–A.[1]

CIVIL AIR PATROL
Falmouth Airport
P. O. Box 191     Falmouth, Mass.

AIRPLANE OWNER'S STATEMENT

Period from 10/1 to 10/15, 1942, inclusive

    Ship NC 32253           Horsepower 90

| | | | |
|---|---|---|---|
| Total Hours Flown 16: | | at 10.65 | $170.40 |
| Operations & Maintenance | | $74.80 | |
| Crash Insurance and Accident Insurance | | 39.60 | |
| Depreciation due Owner | | 56.00 | |
| Total per Airplane Voucher | | | $170.40 |
| Depreciation due Owner | | | $56.00 |
| Less deductions Radio Chgs | $10.00 | | |
| Total Deductions | | | $10.00 |
| Net Balance per Check No. 25 | | | $46. |

JOHN J. KILCOYNE
*Administration Section Head*

7. On December 19, 1942, at or about 4:40 o'clock in the afternoon, at Caswell's Farm, Shoreham, Vermont, while being flown by Lt. Harry E. Butterfield, Jr.; (License No. 74610) on an official mission, with Lt. Arnold Larson and Lt. Joseph Balch as passengers, the aircraft crashed and was rendered unairworthy.

8. The salvage was thereafter trucked to the New England Aircraft School at Boston, Massachusetts, where it was used for ground school student instruction.

9. During May and June 1943, petitioners expended $1,377.66 in order to restore the said aircraft to airworthiness on or about June 1, 1943. Of the sum expended, petitioners recovered $525.88 on September 16, 1943, under policy with Aero Insurance Underwriters. A copy of the memorandum of insurance, No. CAP–H–1301, is attached and marked Exhibit 2–B.[2] Petitioners also recovered $432 on November 21, 1943, from the F & G Engine Company from the salvage of the motor.

10. On June 8, 1943, the aircraft was returned to petitioners pursuant to Special Order No. 159, in words and figures following:

RESTRICTED

WAR DEPARTMENT
Headquarters, Army Air Forces

Civil Air Patrol

| | |
|---|---|
| Special Orders } | NATIONAL HEADQUARTERS, AFRCP |
| No. 159 } | WASHINGTON, D. C., June 8, 1943 |

1. Authority LI–1, AAF* Anti-submarine Command 11/27/42, Aircraft Stinson NC 32253 (owner—James Moore) is relieved from active duty and assignment at CAP Coastal Patrol No. 18, Falmouth, Massachusetts.

By direction of National Commander JOHNSON:

HARRY H. BLEE
*Colonel, Air Corps*
*Operations Officer*

OFFICIAL
[Signed]
    HOWARD S. STERNE
    HOWARD S. STERNE
    *Major, Air Corps*
    *Asst. Operations Officer*
    *Civil Air Patrol*

DIST:

| | |
|---|---|
| 1–Per individual | 2–CP File |
| 1–Personnel | 1–Each Wing Hq. |
| 1–Fiscal | 1–Each Sq. Hq. |
| 1–Operations | |

*NOTE: Abbreviations mean Letter of Instruction, Army Air Forces.

---

[2] Ex. 2–B, though adopted in full as part of our findings of fact, is here set forth, only so far as considered material, as follows:
It is dated June 1, 1942, and addressed to James G. Moore. It certifies that there has been

11. The Civil Air Patrol was organized May 20, 1941, by Executive Order No. 8757 (6 Federal Register 2517) as amended by Executive Order No. 9134 issued April 15, 1942 (7 Federal Register 2887) and operated under the direction of officers of the Army Air Crops.

12. By Executive Order No. 9339, issued April 29, 1943, (8 Federal Register 5659) the said Civil Air Patrol was transferred to the War Department and became an auxiliary of the Army Air Forces.

13. On or about June 21, 1943, the said aircraft was requisitioned by the Department of Commerce, Civil Aeronautics Division, CCA War Training Service and was appraised by Kenneth E. Neland, Senior Aircraft Supervisor, at the sum of $4,369.64, which sum was paid to the petitioners September 22, 1943.

14. Petitioners deducted from income for the taxable year 1942 as a war loss the depreciated value of the aircraft to wit, the sum of $3,481, relying on section 127 (a) (1), Internal Revenue Code.

15. To cover the sale of the airplane, petitioners added to income for the taxable year 1943, the sum of $4,225.66 computed as follows:

```
Received on sale of airplane to U. S. Government_____ $4, 300. 00
Less  repairs_____      74. 34
                                                      _____
                                                        4, 225. 66
```

16. Respondent determined that petitioners had incurred a loss in the amount of $419.78 deductible in 1942, the amount of said loss being the difference between the amounts expended by petitioners to restore the airplane to service and the sums recovered as set forth above in paragraph No. 9, and that petitioners realized a capital gain in the amount of $888.64 in 1943 upon the sale of the airplane to the United States. The capital gain represents the difference between the net selling price of the airplane of $4,369.64 and the adjusted basis of $3,481.

17. If respondent's position is upheld by this Court, the correct amount of the deficiency is $300.12.

Section 127 of the Internal Revenue Code, so far as pertinent to consideration of this case, provides as follows:

issued and delivered to Civil Air Patrol of the United States Government a special aircraft hull policy subject to provisions, conditions, and limitations of which aircraft owned by private interests and operated under Civil Air Patrol operations orders are insured. The term of the policy is June 1, 1942, to June 1, 1943, and covers a landplane Stinson-10 A, Certificate No. NC32253 to be used on C. A. P. Coastal Patrol operations, the amount of the insurance being $5,500. It further provides that the coverage shall attach automatically to the aircraft from the time it commences flight under orders from the Civil Air Patrol officer having jurisdiction directing that it be dispatched for duty at a designated place and terminates when participation in the Civil Air Patrol operation terminates (or upon expiration of the policy) ; that the coverage shall apply only during Civil Air Patrol operations performed at the request of and with funds furnished by any Federal or State government of the United States, or any sub-division, unit, department, or agency thereof, by the American Red Cross, or by any war industry ; that the policy shall apply for the benefit of the legal owner or mortgagee of each individual aircraft as shown on the application form.

**SEC. 127. WAR LOSSES.**

(a) CASES IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED.—For the purposes of this chapter—

(1) PROPERTY NOT IN ENEMY COUNTRIES.—Property destroyed or seized on or after December 7, 1941, in the course of military or naval operations by the United States or any other country engaged in the present war shall be deemed to have been destroyed or seized on a date chosen by the taxpayer in the manner provided in paragraph (4) * * *.

\* \* \* \* \* \* \*

(b) AMOUNT OF LOSS ON DESTROYED OR SEIZED PROPERTY.—In the case of any property or interest in or with respect to property deemed to be destroyed or seized under subsection (a)—

(1) The amount of the loss on account of such property or interest shall be determined with regard to any recoveries with respect thereto in the taxable year but without regard to any possibility of recovering such property or interest, or of receiving any compensation (other than insurance or similar indemnity) on account of such property or interest in the taxable year or in any future taxable year.

Treasury Regulations 111, section 29.127 (a)–1 and 2 and (b)–1, provide in part as follows:

Section 127 (a) (1) refers to a destruction or seizure by the United States or any other country engaged in the present war. * * * Furthermore, the military or naval operations need not be carried on by the regular forces of the countries engaged in the present war, but it is sufficient if such operations are carried on by any forces supported by or operating in conjunction with any such country. For example, nationals of the D country form an independent fighting force for the liberation of their country, which was conquered by an enemy of the United States, and such fighting force operates in conjunction with the forces of one or more of the United Nations. The military or naval operations of such force are considered for the purposes of section 127 (a) (1) as military or naval operations by the countries, engaged in the present war, with which such forces operate.

The term "military or naval operations" in section 127 (a) (1) is used in a broad sense to cover all actions incident to belligerent activities, whether in furtherance of or in opposition to such activities. It includes operations carrying out a scorched earth policy or rendering a position under threat of attack or other danger more secure or less desirable to the attacker. For example, when invasion of a certain area by the forces of an enemy is imminent, civilians in such area burn and otherwise destroy warehouses and other property in such area. Such property is destroyed in the course of military or naval operations of the enemy. However, the orderly requisition or condemnation of property by any government, in the ordinary course of which the taxpayer is entitled to fair compensation, is not a destruction or seizure in the course of military or naval operations.

\* \* \* \* \* \* \*

The loss upon the property treated as destroyed or seized under section 127 (a) and (e) is determined as if the taxpayer's interest in such property had ceased by reason of such destruction or seizure. The loss is determined in the same manner as in the case of any other loss by casualty (see sections 29.23 (e)–1 and 29.23 (f)–1 except that the possibility of recovering such property described in section 127 (a) or (e) or of recovering any compensation (other than insurance or similar

indemnity) on account of such property or interest in the taxable year or in any future taxable year (such as the return of the property, or an award by a government, upon the termination of the war) is disregarded both in determining whether the loss is evidenced by a closed and completed transaction and in determining the amount of the loss. Insurance or any other certain indemnity by a government is not disregarded. If during the same taxable year in which the destruction or seizure is deemed to occur the taxpayer recovers the property, recovers money or other property in lieu of such property, or receives compensation for such property, or if during such taxable year the possibility of any such recovery or of receiving any such compensation develops into a recognized right to such recovery or compensation, such facts must be taken into account in determining whether any loss was sustained and, if a loss was sustained, the amount of the loss. * * *

Under the above statute and regulations, did the petitioners err in deducting from their income for 1942 $3,481, the depreciated value of the aircraft, and in adding to their income for 1943, because of the sale of the airplane under requisition by the Department of Commerce, the amount received, $4,369.64, less deductions, a net of $4,225.66? And did the Commissioner err in determining that the petitioners had a capital gain in 1943 of $888.64, the difference between the selling price of the airplane, $4,369.64, and the adjusted basis of $3,481; and in determining that in 1942 petitioners had incurred a loss of $419.78, being the difference between the $1,377.66 expended by the petitioners to restore the airplane to service and the $957.88 realized by the petitioner by recovery of $525.88 under the insurance policy and $432 from salvage of the motor?

The gist of the petitioners' position is that the airplane was either seized or destroyed within the meaning of section 127 (a) (1) of the Internal Revenue Code and that, therefore, it was a war loss in 1942, so that they could properly take a loss of $3,481, the depreciated value of the airplane, without regard to future recovery, and account for the recovery, when made in 1943. The respondent, in substance, contends that within Regulations 111, section 29.127 (a)–2, there was "orderly requisition or condemnation of property * * * in the ordinary course of which the taxpayer is entitled to fair compensation," so that there was no destruction or seizure. The petitioners do not challenge the validity of the regulations, but, in substance, contend that there was no orderly requisition; that procedure had not yet been set up and it was not set up until the War Production Board's general limitation order L–262 was issued on January 26, 1943, for the orderly requisition or condemnation of private aircraft; that the telegram from the office of Civilian Defense, Civil Air Patrol, of October 5, 1942, was a seizure, but that, if not, there was destruction within the meaning of the statute when the airplane crashed while in the exclusive possession of the Civil Air Patrol on December 19, 1942; and that such

destruction was brought about "in the course of military or naval operations" of the United States within the meaning of section 127 (a) (1).

We agree that the airplane crashed "in the course of military or naval operations by the United States," but, after study of all of the facts and the law involved, we are not convinced that within the statute and its interpretation in the regulations there was anything other than "orderly requisition" of the property. Petitioners, on brief, say that the assignment to active duty in the telegram of October 5, 1942, was an appropriation or seizure and that "petitioners saw fit to so consider it, took no steps to contest its validity, and almost immediately delivered the aircraft, in accordance with the telegraphic instructions." Such taking over of the airplane does not seem to us to be seizure within the intent of the statute and regulations. The petitioners' reference to the War Production Board's general limitation order L–262, issued January 26, 1943, indicates that they regard (and we regard) the matter within the Act of October 16, 1941, section 721 U. S. C. A. appendix, and the Second War Powers Act of 1942, March 27, 1942, 50 U. S. C. A. 633, pursuant to which the War Production Board "had power to formulate policies and programs relating to equipment needed for the war effort." *Louisville Flying Service* v. *United States*, 64 Fed. Supp. 938. Under that case payment for property requisitioned need not be made at the time of the taking. Under the statute of October 16, 1941, provision was made for the requisition of property and the payment therefor. Therefore, even though the necessary machinery had not, at the time of the taking of the airplane here involved, been set up for appraising and paying, the petitioners were "entitled to fair compensation" within the above regulations, and we are unable to say, on the record before us, that there was not orderly requisition and right to fair compensation, both statutory and constitutional. The respondent urges the Fifth Amendment to the Constitution of the United States in that regard, but reliance need not be based upon the Constitution alone.

Moreover, we are unable, in the facts before us, to see destruction of the airplane. It crashed, but a few months later it was so repaired, at a cost of $1,377.66, as to be airworthy, and soon sold for $4,369.64. The repair cost was about 25 per cent of the original cost and about 40 per cent of the depreciated value of the airplane. The petitioners received only $525.88 from the insurance company. They received, moreover, $432 from salvage of the motor. All this, in our view, fails to show destruction of the property within the intendment of section 127 (a) (1).

Regarding the situation before us as not within the meaning of sec-

tion 127 (a) (1), we hold that the petitioners have not shown error on the part of the Commissioner in the computation of taxes for 1943, and 1942, which is considered because of the tax forgiveness features involved.

*Decision will be entered for the respondent.*